**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HETERO LABS LIMITED, HETERO LABS LTD. UNIT III, and CAMBER PHARMACEUTICALS, INC., <br><br> Plaintiffs <br><br> v. <br><br> OTSUKA AMERICA PHARMACEUTICALS, INC. and AVANIR PHARMACEUTICALS, LLC f/k/a AVANIR PHARMACEUTICALS, INC. | C.A. No. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Hetero Labs Limited, Hetero Labs Ltd. Unit III, and Camber Pharmaceuticals, Inc. (collectively, "Hetero"), by their undersigned attorneys, for their Complaint against Defendants Otsuka America Pharmaceutical, Inc. ("Otsuka America") and Avanir Pharmaceuticals, LLC f/k/a Avanir Pharmaceuticals, Inc. ("Avanir") (collectively, "Otsuka" or "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory and monetary relief arising from Defendants' assertion and enforcement of U.S. Patent No. 7,659,282 ("the '282 Patent") to exclude Hetero from commercially launching its FDA-approved generic version of NUEDEXTA®. Hetero seeks declarations that the asserted claims of the '282 Patent are invalid under one or more provisions of the Patent Act, including 35 U.S.C. §§ 102, 103, and 112, unenforceable because of inequitable conduct, and not infringed by Hetero, as well as damages resulting from Defendants' anticompetitive enforcement of a patent procured through fraud on the United

1

States Patent and Trademark Office ("USPTO"). A copy of the '282 Patent is attached as **Exhibit A**.

2.      Hetero submitted Abbreviated New Drug Application ("ANDA") No. 218426 to the United States Food and Drug Administration ("FDA") seeking approval to market capsules containing 20 mg dextromethorphan hydrobromide and 10 mg quinidine sulfate ("Hetero's ANDA Product") before expiration of the '282 Patent. Hetero's ANDA Product is a generic version of NUEDEXTA®.

3.      The controversy is concrete and substantial notwithstanding the impending expiration of the '282 Patent. On July 23, 2025, Defendants obtained from this Court a preliminary injunction prohibiting Hetero from launching its FDA-approved ANDA Product. Hetero has consequently been excluded from the market and deprived of sales, revenues, and profits it otherwise would have earned from commercial launch. *Otsuka America Pharmaceutical, Inc., et al. v. Hetero Labs Limited et al.*, C.A. No. 1:25-cv-00647-GBW, D.I. 100 (D. Del. July 23, 2025)

4.      On July 1, 2026, the United States Court of Appeals for the Federal Circuit affirmed the preliminary injunction but held that the District Court improperly waived the security required by Federal Rule of Civil Procedure 65(c), vacated the bond waiver, and remanded for determination of an appropriate bond. *Otsuka America Pharmaceutical, Inc., et al. v. Hetero Labs Limited, et al.*, No. 2025-2016, D.I. 58 (Fed. Cir. July 1, 2026).  The Federal Circuit emphasized that Hetero's proposed launch is "clearly a commercial, money-making activity" and that Third Circuit law narrowly limits waiver of Rule 65(c) security.

5.      Expiration of the '282 Patent therefore does not eliminate the parties' dispute. Hetero has suffered an accrued and accruing monetary injury from its exclusion from the

market during the injunction period, and resolution of validity, enforceability, and infringement bears directly on whether Hetero was wrongfully enjoined and may recover damages caused by that injunction, including damages secured by the Rule 65(c) bond required on remand.

6.      Hetero also alleges that Avanir obtained the '282 Patent through knowing and intentional misrepresentations and omissions to the USPTO during prosecution concerning whether the original patent disclosure supported the claims Avanir materially amended years later. The USPTO allowed those claims only after Avanir relied on purportedly "surprising" low-dose quinidine results that, according to Avanir's own inventor declaration, were discovered years after the asserted priority date and only after the FDA required Avanir to reduce its quinidine dose dramatically.

## THE PARTIES

7.      Plaintiff Hetero Labs Limited is a corporation organized and existing under the laws of India, having a principal place of business at Floor 9-11, Tower 30, RMZ Nexity, Sy. No. 83/1, Knowledge City, Raidurg, Hyderabad - 500081 Telangana, India.

8.      Plaintiff Hetero Labs Ltd. Unit III is a division or affiliated unit of Hetero Labs Limited, with a principal place of business at Factory 22- 110, IDA, Jeedimetla Hyderabad – 500055, Telangana, India.

9.      Plaintiff Camber Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 800 Centennial Avenue, Suite 1, Piscataway, New Jersey 08854.  Camber is affiliated with Hetero Labs Limited and is responsible for marketing Hetero's generic version of NUEDEXTA® in the United States, including in Delaware.

3

10. Defendant Otsuka America Pharmaceutical, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 508 Carnegie Center Drive, Princeton, New Jersey 08540.

11. Defendant Avanir Pharmaceuticals, LLC f/k/a Avanir Pharmaceuticals, Inc., is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 508 Carnegie Center Drive, Princeton, New Jersey 08540.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1338(a), 2201, and 2202, and 15 U.S.C. §§ 2 and 15.

13. An actual, substantial, and justiciable controversy exists between Hetero and Defendants concerning validity, enforceability, and infringement of the '282 Patent because Defendants sued Hetero for infringement and obtained a preliminary injunction preventing Hetero from commercially launching its FDA-approved ANDA Product.

14. That controversy remains live notwithstanding the impending expiration of the '282 Patent because Hetero has suffered an accrued and accruing monetary injury during the period in which it has been excluded from the market, and continuing due to Hetero's delay in entering the market caused by the injunction. The Federal Circuit vacated the District Court's waiver of security under Rule 65(c) and remanded for determination of an appropriate bond securing Hetero against damages sustained if it is ultimately determined to have been wrongfully enjoined.

15. A final determination concerning the validity, enforceability, and infringement of the '282 Patent and Hetero's damages therefore has concrete legal and monetary consequences for the parties, including Hetero's entitlement to seek recovery of damages

4

caused by the preliminary injunction, including those secured by the Rule 65(c) bond.

16. Defendants are subject to personal jurisdiction in this District because they are Delaware entities and because they have purposefully availed themselves of this forum, including by repeatedly filing actions in this Court to enforce the '282 Patent against generic pharmaceutical manufacturers and by suing Hetero here for alleged infringement of the '282 Patent in *Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited et al.,* C.A. No. 1:25-cv-00647-GBW.

17. Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b), including because Defendants reside in Delaware for purposes applicable to Hetero's declaratory and antitrust claims and because a substantial part of the events giving rise to this action occurred in this District.

## THE '282 PATENT AND ITS PROSECUTION

18. The '282 Patent, titled "Pharmaceutical Compositions Comprising Dextromethorphan and Quinidine for the Treatment of Neurological Disorders," issued on February 9, 2010. Otsuka asserts ownership of the '282 Patent. A true copy is attached as Exhibit A.

19. Avanir filed the application that issued as the '282 Patent on January 12, 2005 and asserted priority to July 17, 2002.

20. On January 9, 2009, the Patent Examiner issued a Final Office Action rejecting the then-pending claims as obvious over prior art including Smith '207, which disclosed combinations of dextromethorphan and quinidine and quinidine doses as low as 50 mg/day.

21. On July 7, 2009, Avanir responded by materially amending the claims. Among other things, Avanir amended claim 1 to require approximately 20 mg/day to 80 mg/day of

dextromethorphan, approximately 10 mg/day to less than 30 mg/day of quinidine, and a dextromethorphan-to-quinidine weight-to-weight ratio of 1:0.5 or less.

22.     Avanir did not contend merely that those limitations distinguished the prior art. It told the Examiner that patentability rested on purportedly "surprising" discoveries concerning dramatically reduced quinidine dosing, unexpectedly low dextromethorphan blood levels, and reversal of the prior-art DM:Q ratio.

> Patentability is based upon the surprising discovery that one can dramatically lower Q by as much as 87% of the previously recommended daily dose without the need to increase DM to maintain the therapeutic benefit. Patentability is further supported by the surprising discovery that a comparable therapeutic benefit is observed in PBA patients with DM blood levels 50% below the lowest limit described in the prior art. Finally, the fact that the w/w ratio of DM to Q may be changed such that it is now reversed from that of the prior art's formulations is also a dramatic surprise.

> The *low-dose* quinidine formulations of DM:Q described in this pending application resolves FDA concerns about the safety and tolerability [of] previously tested high-dose quinidine formulations. Three Rule 132 declarations by expert pharmacologists are presented as evidence of the surprising nature and advantages of the invention.

July 7, 2009 Response to Office Action at 4 (emphasis in original).

23.     At the same time, Avanir affirmatively represented to the Examiner that the newly added limitations "find express support in the specification." *Id.* at 5. Avanir specifically stated that the 80 mg/day dextromethorphan endpoint was supported by paragraph 104 of the published application, the quinidine range was supported by original claim 9, and the 1:0.5 ratio was supported by paragraph 103.

> The amendments to claims 1 and 5 are substantive. The amendments to claims 1 and 5 find express support in the specification. ... The recitation of 80 mg/day of DM finds support at paragraph 104 of the original specification reciting 80 mg of DM. The range of quinidine finds support from claim 9. The ratio of 1:0.5 for DM:Q is expressly recited in paragraph 103. The amendments are introduced to bring the claims into better alignment with the surprising results.

*Id.*

24.     One of the Rule 132 declarations submitted with Avanir's July 7, 2009 response

was the declaration of named inventor Dr. Laura E. Pope. Her declaration described a clinical-development history materially inconsistent with the proposition that the inventors possessed and enabled the materially amended low-dose quinidine invention as of the asserted July 17, 2002 priority date or the January 12, 2005 filing date.

25.     Dr. Pope explained that Avanir's first "low-dose quinidine" clinical trials used 30 mg dextromethorphan and 30 mg quinidine twice daily, or 60 mg/day of each compound. She further explained that the FDA refused to approve that regimen and required Avanir to reduce the daily quinidine dose by two-thirds, from 60 mg/day to 20 mg/day.

> "Although the low-dose Q formulation exhibited enough efficacy to ask the FDA for approval, the FDA would not approve this DM:Q combination. They wanted us to further lower the daily dose of quinidine by two thirds from 60 to 20 mg/day."

Rule 132 Declaration of Laura E. Pope, Ph.D. ("Pope Declaration") at 6.

26.     After receiving that letter, Dr. Pope explained that the future success of Avanir's program "was riding on being able to dramatically reduce Q without having to increase[] DM- a considerable challenge considering the unapprovable DM:Q formulation (60 mg DM and 60 mg Q per day) resulted in DM levels at the very threshold of the 100 ng/ml reported by Dr. Smith as necessary to provide therapeutic benefit." *Id.* at 13.

27.     Dr. Pope further stated that, only after the FDA imposed that requirement, Avanir discovered that a regimen containing 60 mg/day dextromethorphan and 20 mg/day quinidine would safely provide significant therapeutic benefit to PBA patients.

> **SURPRISINGLY, WE DISCOVERED A DM:Q COMBINATION WITH 60 MG OF DEXTROMETHORPHAN AND 20 MG OF QUINIDINE PER DAY WILL SAFELY PROVIDE SIGNIFICANT THERAPEUTIC BENEFIT TO PATIENTS WITH PSEUDOBULBAR AFFECT**. ... our later discovery that a mere 20 mg Q per day without increasing DM would still provide efficacy for PBA patients was extremely surprising to me.

*Id.* (emphasis in original).

7

28. Thus, Avanir relied on a post-filing "later discovery" as the unexpected result necessary to overcome the Examiner's obviousness rejection, while simultaneously representing to the Examiner that the materially amended claims reflecting that "surprising" discovery was expressly supported by the original disclosure years earlier, and thus was not "new matter" requiring a new, much later effective filing date.

29. After Avanir submitted its July 7, 2009 response, the Pope declaration, the material claim amendments, and its unexpected-results arguments, the Examiner, in reliance on those submissions, withdrew the obviousness rejection and allowed the claims that issued in the '282 Patent.

## NUEDEXTA®, HETERO'S ANDA PRODUCT, AND THE PRELIMINARY INJUNCTION

30. Avanir received FDA approval of NUEDEXTA® in October 2010 and began marketing it in 2011. NUEDEXTA® is indicated for treatment of pseudobulbar affect ("PBA").

31. Otsuka holds NDA No. 021879 for NUEDEXTA®, which contains dextromethorphan hydrobromide and quinidine sulfate. Otsuka listed the '282 Patent in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book") for NUEDEXTA®.

32. Hetero filed ANDA No. 218426 seeking approval to market a generic version of NUEDEXTA® and submitted a Paragraph IV certification concerning the '282 Patent.

33. On August 28, 2024, FDA approved Hetero's ANDA for Hetero's ANDA Product.

34. On May 22, 2025, Hetero informed Otsuka that it intended to commercially

launch its FDA-approved ANDA Product before expiration of the '282 Patent.

35.   On May 27, 2025, Otsuka sued Hetero in this Court for alleged infringement of the '282 Patent under 35 U.S.C. § 271(e)(2)(A), C.A. No. 1:25-cv-00647-GBW.

36.   On July 23, 2025, the Court entered a preliminary injunction preventing Hetero from launching its ANDA Product. The preliminary-injunction ruling did not constitute a final judgment after trial on validity, enforceability, or infringement.

37.   The Court waived Otsuka's obligation to post security under Rule 65(c), notwithstanding Hetero's request for security to protect against the commercial damages caused by being excluded from the market if Hetero were ultimately found to have been wrongfully enjoined.

38.   Hetero appealed the preliminary injunction and bond ruling to the Federal Circuit, Appeal No. 2025-2016, and this Court stayed Otsuka's infringement action during the appeal.

39.   On July 1, 2026, the Federal Circuit affirmed the preliminary injunction but vacated the waiver of Rule 65(c) security and remanded for the District Court to determine an appropriate amount of security. The Federal Circuit held that waiver of security is narrowly limited under Third Circuit law and that preventing Hetero's generic launch restrains commercial, money-making activity capable of producing substantial damages.

## THE CONTINUING CONTROVERSY AND HETERO'S ACCRUED AND ACCRUING INJURY

40.   The preliminary injunction has prevented Hetero from commercially launching its FDA-approved ANDA Product since July 2025 and has caused Hetero quantifiable economic harm, including lost sales, revenues, and profits.

41.     Rule 65(c) security exists to protect an enjoined party against costs and damages sustained if that party is ultimately found to have been wrongfully enjoined. The Federal Circuit's remand therefore creates a concrete monetary consequence from final adjudication of the patent merits.

42.     Expiration of the '282 Patent on August 13, 2026 will end the patent's prospective exclusionary term, but it will not erase Hetero's accrued and accruing losses or the parties' dispute over whether Hetero was legally entitled to launch during the injunction period.

43.     Hetero seeks adjudication of validity, enforceability, and infringement because those issues bear directly on Hetero's accrued monetary rights arising from its exclusion from the market and on its entitlement to seek recovery, including under the Rule 65(c) security ordered on remand.

## COUNT I
## DECLARATORY JUDGMENT OF INVALIDITY OF THE '282 PATENT UNDER 35 U.S.C. §§ 102, 103, AND 112

44.     Hetero repeats and realleges the preceding paragraphs as though fully set forth herein.

45.     An actual, substantial, and justiciable controversy exists concerning the validity of the asserted claims of the '282 Patent, and that controversy carries concrete monetary consequences because Defendants used the patent to exclude Hetero from the market through a preliminary injunction and the Federal Circuit has required Rule 65(c) security on remand.

46.     The asserted claims of the '282 Patent are invalid under one or more provisions of the Patent Act, including 35 U.S.C. §§ 102, 103, and 112. Among other grounds, the asserted claims are anticipated by prior art under § 102 and/or would have been obvious to a person of

ordinary skill in the art under § 103 in view of the prior art, alone or in combination. The asserted claims are also invalid under § 112, including for lack of adequate written description and lack of enablement. The § 112 defects pleaded below are one example of the grounds on which Hetero contends the asserted claims are invalid and do not limit Hetero's invalidity contentions under §§ 102, 103, 112, or any other applicable provision of law.

47.    The asserted claims require a method of treating PBA or emotional lability using dextromethorphan and quinidine within specified daily dosage ranges—approximately 20 mg/day to 80 mg/day dextromethorphan and approximately 10 mg/day to less than 30 mg/day quinidine—subject to an additional requirement that their weight-to-weight ratio be 1:0.5 or less.

48.    The original disclosure does not describe that claimed combination as an invention possessed by the inventors. Nor does it teach a person of ordinary skill how to practice the full scope of that claimed combination without undue experimentation.

49.    The deficiency is confirmed by Avanir's own prosecution evidence. Avanir's inventor declaration identifies the clinically meaningful 20 mg/day quinidine regimen as a "later discovery" made after the FDA's October 30, 2006 directive and subsequent clinical testing—years after both the asserted priority date and filing date.

50.    When Avanir materially amended claim 1 on July 7, 2009, prosecution counsel did not identify any disclosure in the application that issued as the '282 Patent describing the amended therapeutic regimen as a whole. Instead, Avanir cobbled together separate portions of published application No. 2005/0203125, citing paragraph 103 for the ratio, paragraph 104 for the 80 mg/day dextromethorphan endpoint, and original claim 9 for the quinidine range.

51.    No single paragraph, original claim, clinical study, table, or example expressly or inherently discloses as a ***combined*** set of claim boundaries (i) approximately 20 mg/day to

approximately 80 mg/day dextromethorphan, (ii) approximately 10 mg/day to less than approximately 30 mg/day quinidine, and (iii) a DM:Q weight-to-weight ratio of 1:0.5 or less for treatment of PBA or emotional lability.

52.     No original claim recited those three limitations in combination.

53.     Paragraph 103 lists numerous possible DM:Q ratios. The ratio 1:0.5 appears as one among numerous listed ratios and alternatives.

54.     Paragraph 103 does not expressly disclose the subsequently claimed 1:0.5-or-less ratio together with both the subsequently claimed approximately 20-80 mg/day dextromethorphan range and approximately 10-to-less-than-30 mg/day quinidine range as a combined PBA-treatment regimen.

55.     Paragraph 103 does not report clinical results comparing PBA treatment at a DM:Q ratio of 1:0.5 or less with treatment at ratios above 1:0.5, and it does not identify 1:0.5 as a boundary at which PBA efficacy, safety, or therapeutic performance changes.

56.     Paragraph 104 likewise presents broad menus of possible daily doses and numerous dextromethorphan/quinidine dose pairings for multiple conditions.

57.     The number 80 mg appears in paragraph 104 among numerous possible dextromethorphan dose values. Paragraph 104 does not, however, expressly identify approximately 20-80 mg/day as a dextromethorphan range to be used together with approximately 10 to less than 30 mg/day quinidine and a DM:Q ratio of 1:0.5 or less.

58.     Paragraph 104 includes individual dose pairings that can fall within portions of the later-added numerical limitations, including 40 mg DM with 20 mg Q. But paragraph 104 does not disclose the full subsequently claimed dextromethorphan and quinidine ranges, with their later-selected endpoints, in combination with the later-selected 1:0.5-or-less ratio as a defined

12

therapeutic range.

59. Paragraph 104 does not state that 80 mg/day is a therapeutically significant upper boundary for dextromethorphan when quinidine is restricted below approximately 30 mg/day, or that approximately 30 mg/day is a therapeutically significant upper boundary for quinidine when the ratio is restricted to 1:0.5 or less.

60. Original claim 9 recited approximately 30 mg/day to approximately 60 mg/day quinidine sulfate, not approximately 10 mg/day to less than approximately 30 mg/day quinidine.

61. In original claim 9, approximately 30 mg/day was the lower endpoint of the recited quinidine range.

62. The amended claim instead required quinidine below approximately 30 mg/day. Thus, the same approximately 30 mg/day value that served as the lower endpoint of original claim 9 became the boundary above which the later-amended quinidine range generally did not extend.

63. Original claim 9 also paired its approximately 30-60 mg/day quinidine range with approximately 20-200 mg/day dextromethorphan hydrobromide. Original claim 9 did not identify approximately 30 mg/day as an upper endpoint for a quinidine range beginning at approximately 10 mg/day.

64. Original claim 9 did not state that approximately 30 mg/day marked a transition point at which PBA efficacy, safety, or therapeutic performance materially changed, and did not direct a skilled artisan to use its lower endpoint as the upper boundary of the materially different quinidine range later added to claim 1.

65. The application's disclosed clinical studies further confirm the absence of a disclosure identifying the later-claimed combination as the PBA-treatment invention.

66. The application discloses multiple clinical studies. The studies addressed

13

pharmacokinetics, tolerability, safety, metabolism, and, in one study, efficacy in patients suffering from pseudobulbar affect.

67.    None of those clinical studies demonstrates treatment of PBA using, in combination, approximately 20–80 mg/day dextromethorphan, approximately 10 mg/day to less than 30 mg/day quinidine, and a DM:Q weight-to-weight ratio of 1:0.5 or less.

68.    The study beginning at paragraph [0121] included certain dose amounts that numerically fall within portions of the subsequently claimed ranges, but that study investigated pharmacokinetics and tolerability in subjects who were not being treated for PBA and did not report therapeutic efficacy for PBA.

69.    By contrast, the clinical study beginning at paragraph [0193] expressly evaluated efficacy in subjects suffering from PBA. Paragraph [0194] states that the combination treatment used 30 mg dextromethorphan and 30 mg quinidine twice daily.

70.    That PBA efficacy regimen therefore administered approximately 60 mg/day dextromethorphan and approximately 60 mg/day quinidine at an approximately 1:1 DM:Q ratio.

71.    The PBA regimen actually tested for efficacy thus falls outside two separate limitations later added to the asserted claims: it does not satisfy the requirement of approximately 10 mg/day to less than approximately 30 mg/day quinidine, and it does not satisfy the requirement of a DM:Q weight-to-weight ratio of 1:0.5 or less.

72.    No disclosed PBA efficacy study reports therapeutic efficacy for a regimen satisfying the subsequently claimed quinidine range and DM:Q ratio in combination.

73.    Thus, when the original application moves beyond broad numerical alternatives and reports the regimen actually tested for PBA efficacy, the disclosed regimen is materially different from the one Avanir later claimed and has now asserted against Hetero.

14

74.    The PBA regimen actually tested for efficacy therefore falls outside two separate limitations subsequently added to the asserted claims: it does not satisfy the requirement of approximately 10 mg/day to less than approximately 30 mg/day quinidine, and it does not satisfy the requirement of a DM:Q weight-to-weight ratio of 1:0.5 or less.

75.    No disclosed PBA efficacy study reported therapeutic efficacy for a regimen having a DM:Q weight-to-weight ratio of 1:0.5 or less.

76.    And no disclosed PBA efficacy study demonstrated therapeutic efficacy using the subsequently claimed dosage ranges and ratio in combination.

77.    Thus, when the specification moves beyond broad menus of possible numbers and identifies preferred therapeutic dosing or reports actual PBA efficacy, it does not identify the subsequently claimed approximately 10-to-less-than-30 mg/day quinidine range in combination with the approximately 20-80 mg/day dextromethorphan range and 1:0.5-or-less ratio.

78.    Avanir's inventor declaration confirms the significance of that omission. Dr. Pope described the efficacy of a regimen using only 20 mg/day quinidine as a "later discovery" made only after the FDA required Avanir to reduce quinidine from the previously tested 60 mg/day regimen and Avanir undertook further clinical investigation.

79.    The asserted claims therefore fail the written-description requirement because the original disclosure does not reasonably convey to a person of ordinary skill that the inventors possessed the later-assembled combination and its full claimed scope as of the asserted priority date or filing date. The claim can be reconstructed only retrospectively by selecting limitations and endpoints from disparate disclosures with knowledge of the claim later sought.

80.    The asserted claims independently fail the enablement requirement. The original disclosure did not teach a person of ordinary skill that quinidine could be restricted to the later-

15

claimed sub-30-mg/day range, while also satisfying the 1:0.5-or-less ratio, and still provide the claimed therapeutic treatment of PBA throughout the claimed dosage scope without further clinical investigation. Avanir's own inventor later described the effective 20 mg/day PBA regimen as a surprising later discovery reached only after additional clinical work.

81.     For the reasons alleged above, including the § 112 deficiencies set forth as a specific example, Hetero is entitled to a declaration that the asserted claims of the '282 Patent are invalid under one or more provisions of the Patent Act, including 35 U.S.C. §§ 102, 103, and 112. That declaration has concrete legal and monetary consequences because adjudication of validity bears directly on whether Hetero was wrongfully enjoined and may recover damages caused by its exclusion from the market, including damages within the Rule 65(c) security.

## COUNT II
## DECLARATORY JUDGMENT OF UNENFORCEABILITY OF THE '282 PATENT
## (INEQUITABLE CONDUCT)

82.     Hetero repeats and realleges the preceding paragraphs as though fully set forth herein.

83.     Avanir's patent prosecution attorneys, including Kenneth A. Weber, owed a duty of candor and good faith to the USPTO during prosecution of the application that issued as the '282 Patent.

84.     Avanir's patent prosecution attorneys violated their duty of candor and good faith when they filed the July 2007 Response to Final Office Action by misrepresenting that the original specification provided support for the amended claims included in the response and withholding the material information that the inventors did not have possession of the full scope of the claimed inventions as of the priority date or the filing date of the patent application. Indeed, they did not have possession of the full scope of the claimed inventions until they tested low-dose quinidine

16

formulations in response to the FDA refusal to approve their new drug application unless they lowered the quinidine dosage by two thirds.

85.     Thus, the "who" is Kenneth A. Weber, Avanir's prosecuting attorney, who personally signed and submitted Avanir's July 7, 2009 Response to Final Office Action and made the representations identified below to the Examiner on Avanir's behalf.

86.     The "when" and "where" are the July 7, 2009 Response to Final Office Action filed in the prosecution of the application that issued as the '282 Patent, specifically the portion of the response addressing the substantive amendments to claims 1 and 5 and the asserted support for those amendments in published application No. 2005/0203125.

87.     The "what" includes Mr. Weber's affirmative representation that the substantive amendments to claims 1 and 5 "find express support in the specification," and his specific representations that paragraph 103 supported the newly added 1:0.5 ratio, paragraph 104 supported the 80 mg/day dextromethorphan endpoint, and original claim 9 supported the amended quinidine range. Mr. Weber did not identify any single disclosure that set out the three newly added limitations combined together as the claimed therapeutic regimen.  Without that combination, the three separately-disclosed, disjointed limitations do not disclose the claimed invention.

88.     Those representations were false or materially misleading. Paragraph 103 contains 1:0.5 among numerous ratios but does not disclose that ratio together with both later-claimed dosage ranges; paragraph 104 contains 80 mg and numerous individual dose pairings but does not disclose the later-claimed ranges and ratio as a combined set of therapeutic boundaries; and original claim 9 recites approximately 30-60 mg/day quinidine, with 30 mg/day as its lower endpoint, rather than the amended approximately 10 mg/day to less than 30 mg/day range.

89.     The "what" also includes material information showing that the original disclosure

17

did not identify the later-claimed combination as the PBA-treatment invention. The application's PBA efficacy study used approximately 60 mg/day dextromethorphan and 60 mg/day quinidine at an approximately 1:1 ratio, outside both the later-added sub-30-mg/day quinidine limitation and the 1:0.5-or-less ratio limitation. None of the studies contained the claimed ranges in combination with the claimed ratio to investigate PBA efficacy.

90.    The "what" further includes material information concerning the inventors' lack of possession and enablement of the materially amended low-dose quinidine invention as of the asserted priority and filing dates. Avanir's own clinical-development history showed that the inventors had not discovered that a regimen using only 20 mg/day quinidine would remain safe and therapeutically effective for PBA until years later, after the FDA required Avanir to reduce its previously tested 60 mg/day quinidine regimen by two-thirds and Avanir performed additional clinical testing.

91.    The "where" for that information was known to Avanir and was reflected both in the original specification and in the Pope declaration submitted with the same July 7, 2009 response. Dr. Pope expressly described the effectiveness of a 20 mg/day quinidine PBA regimen as a "later discovery" that was "extremely surprising" and tied that discovery to the FDA's post-filing directive to reduce quinidine from 60 mg/day to 20 mg/day.

92.    The "how" is that the Examiner had finally rejected the claims as obvious, and Avanir overcame that rejection by materially narrowing the claims, characterizing the low-dose quinidine result as unexpected, and simultaneously assuring the Examiner that the original specification expressly supported the newly assembled limitations. Those representations allowed Avanir to obtain claims directed to the later-discovered low-dose regimen while wrongfullyretaining the benefit of the earlier asserted priority date.

93.    The misrepresentations and omissions are but-for material. Before the July 7, 2009 response, the Examiner had finally rejected the claims as obvious. After Avanir amended the claims, relied on purported unexpected results, and represented that the original disclosure expressly supported those amendments, the Examiner withdrew the rejection and allowed the claims. Had the Examiner been informed that the cited passages did not disclose the later-claimed combination as a therapeutic invention, that original claim 9 placed 30 mg/day at the bottom of a different 30-60 mg/day quinidine range, and that the effective 20 mg/day PBA regimen was a later clinical discovery, the asserted claims would not have issued.

94.    Mr. Weber knew the representations were material because he selected and identified the precise portions of the specification that purportedly supplied support for the newly added limitations in the response submitted to overcome the Examiner's final rejection. He also had before him the original specification's clinical-study disclosures and the Pope declaration submitted with that same response.

95.    Mr. Weber nevertheless told the Examiner that the amendments "find express support in the specification," including that original claim 9 supported the amended quinidine range, despite claim 9 placing 30 mg/day at the lower end of a materially different 30-60 mg/day range, and despite the absence of any disclosed PBA efficacy study satisfying the later-added sub-30-mg/day quinidine and 1:0.5-or-less ratio limitations together. He likewise failed to disclose that the clinically significant 20 mg/day PBA result underlying the amended claims had been described by the inventor as a later and surprising discovery.

90.    The single most reasonable inference from Mr. Weber's affirmative and specific representations, the mismatch between those representations and the cited disclosures, his knowledge of the specification's actual clinical studies and the accompanying Pope declaration,

19

the materiality of the representations to overcoming the final rejection, and his failure to disclose the later-discovery facts is that he acted with the specific intent to deceive the USPTO into allowing claims to subject matter that Avanir had not possessed or enabled at the asserted priority or filing dates.

96.     Despite knowing that the omitted § 112 defects were material, Mr. Weber deliberately withheld from the Examiner that the inventors lacked possession of, and had not enabled, the claimed invention as of the asserted priority date, in order to secure issuance of the '282 Patent. The incentive was substantial: the patent covered a drug expected to be highly profitable because no FDA-approved drug product then existed to treat PBA. The single most reasonable inference from Mr. Weber's prosecution statements, his knowledge of the defects' materiality, and his complete failure to disclose them is that he acted with specific intent to deceive the USPTO.

97.     By reason of the foregoing inequitable conduct, the asserted claims of the '282 Patent is unenforceable.

**COUNT III**
**DECLARATORY JUDGMENT OF NONINFRINGEMENT OF THE '282 PATENT**

98.     Hetero repeats and realleges the preceding paragraphs as though fully set forth herein.

99.     An actual, substantial, and continuing controversy exists concerning whether Hetero's ANDA Product infringes the asserted claims of the '282 Patent. Defendants sued Hetero for infringement and obtained a preliminary injunction prohibiting Hetero from commercially launching its FDA-approved product.

100.     Hetero denies that the manufacture, use, offer for sale, sale, or importation of its

ANDA Product infringes any valid and enforceable claim of the '282 Patent.

101. Hetero therefore seeks a declaration that its ANDA Product does not infringe any valid and enforceable claim of the '282 Patent. A final infringement determination continues to carry concrete monetary consequences because whether Hetero ultimately had a lawful right to launch bears directly on whether it was wrongfully enjoined and may recover resulting damages.

**COUNT IV**
**MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**(WALKER PROCESS FRAUD)**

102. Hetero repeats and realleges the preceding paragraphs as though fully set forth herein.

103. Avanir procured the '282 Patent through knowing and willful fraud on the patent office.

104. The person who made the materially false representations was Kenneth A. Weber, Avanir's prosecuting attorney, who signed and submitted the July 7, 2009 Response to Final Office Action in the prosecution of the application that issued as the '282 Patent.

105. The false representations were made in the July 7, 2009 submission to the USPTO Examiner after the Examiner had finally rejected the pending claims as obvious. Mr. Weber represented that the materially amended claims "find express support in the specification" and specifically asserted that paragraph 103 supported the 1:0.5 ratio, paragraph 104 supported the 80 mg/day dextromethorphan endpoint, and original claim 9 supported the amended quinidine range. Thus, Mr. Weber falsely stated that the amended claims are entitled to the priority date of July 17, 2002.

106. In reality, those statements were materially false or misleading for the reasons pleaded above. The cited passages do not disclose the later-claimed dosage ranges and ratio as a

combined therapeutic invention; original claim 9 instead recites approximately 30-60 mg/day quinidine with 30 mg/day as its lower endpoint; the application's PBA efficacy study used approximately 60 mg/day quinidine at an approximately 1:1 ratio; and not a single disclosed study containing a 20 mg/day quinidine regimen investigated PBA efficacy.

107.    The fraudulent omission included Avanir's failure to disclose that its own inventors had not discovered the efficacy and safety of the critical 20 mg/day quinidine PBA regimen until years after the asserted priority and filing dates, after the FDA rejected Avanir's prior 60 mg/day quinidine regimen and required a two-thirds dose reduction. That fact was reflected in the Pope declaration submitted with the same July 7, 2009 response and was therefore known to Avanir and its prosecution team.

108.    Dr. Pope's declaration submitted to the USPTO concedes that the Avanir inventors did not even believe a low-dose quinidine formulation would be safe and effective as of the priority date of July 17, 2002 or the filing date, or at any time until both: (1) the FDA rejected its application for its originally proposed formulation and said it would only approve an application if the quinidine dose was reduced by two thirds; and (2) Avanir conducted clinical studies thereafter with the low-dose quinidine formulation and was *surprised* to see that it was tolerated by patients and effective to treat PBA.

109.    The fraudulent scheme was calculated to mislead the Examiner in order to obtain claims that the Examiner had otherwise rejected as obvious: Avanir characterized the post-filing low-dose quinidine result as an unexpected discovery sufficient to establish patentability while falsely representing that the original disclosure already supplied support for the materially amended claims embodying that discovery.

110.    The fraud was material and caused the asserted claims of the '282 Patent to issue.

But for the false representations and omissions concerning support for the amended claims, the Examiner would not have withdrawn the final obviousness rejection and allowed the asserted claims.

111. Defendants thereafter enforced its fraudulently procured '282 Patent against Hetero by suing Hetero in this District and obtaining a preliminary injunction that prevented Hetero from launching its FDA-approved ANDA Product.

112. Through that enforcement, Defendants maintained the exclusion of lower-priced generic competition that otherwise threatened NUEDEXTA®'s sales and monopoly profits.

113. The relevant product market is the market in the United States for NUEDEXTA® and its generic equivalents for the treatment of pseudobulbar affect. NUEDEXTA® is an FDA-approved prescription drug specifically indicated for the treatment of PBA, and Hetero's FDA-approved ANDA Product is a generic version of NUEDEXTA® that would compete directly with NUEDEXTA® for prescriptions and sales.

114. Defendants' own statements to this Court confirm the absence of another FDA-approved PBA treatment. On page 4 of their [REDACTED] Amended Opening Brief in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction, Dkt. 94 ("Otsuka PI Br."), Otsuka stated:

> "**NUEDEXTA® is the first and only FDA-approved treatment for PBA on the market.**"

Otsuka PI Br. at 4 (emphasis added).

115. Otsuka had more than a dangerous probability of achieving monopoly power in the market for FDA-approved medications containing dextromethorphan and quinidine. It already has had monopoly power from at least the date the '282 Patent issued. It has 100% of sales in the United States market for FDA-approved formulations of drugs to treat pseudobulbar affect.

116.    Based on information and belief, Otsuka maintains a high retail cash price averaging roughly $1,500 to $2,100 for a supply of 60 capsules.

117.    Defendants possessed monopoly power in the relevant market, as shown by NUEDEXTA®'s dominant position, the absence of FDA-approved products reasonably interchangeable for the same indicated use, substantial regulatory and patent-related barriers to entry, and Defendants' ability to maintain prices above competitive levels while Hetero's FDA-approved generic competition was excluded.

118.    Defendants' own statements in seeking the preliminary injunction further establish the direct and substantial competitive constraint that Hetero's entry would impose on NUEDEXTA®. On page 15 of Dkt. 94, Defendants stated: "When a generic version of a branded drug product is allowed to launch, the branded company must take immediate action to reduce the cost structure of its branded product to compete." *Id.* at 15.

119.    Defendants' statement that a branded manufacturer must "reduce the cost structure of its branded product to compete" upon generic entry reflects the price erosion and other downward economic pressure created by generic competition. Hetero's launch would have subjected NUEDEXTA® to that competitive pressure; Defendants' enforcement of the '282 Patent and the resulting preliminary injunction prevented that competition from occurring.

120.    Defendants also expressly recognized that the injunction would prevent Hetero from earning profits from sales of its generic product. On page 19 of Dkt. 94, Otsuka stated that "the only harm that Hetero might suffer from a preliminary injunction would be the ability to earn profits sooner on Defendants' ANDA Product." Defendants further stated that "lost profits due to lost sales generally constitutes the type of harm that is fully compensable through money damages." *Id*. at 19.

24

121.   Taken together, Defendants' own statements confirm the competitive relationship between NUEDEXTA® and Hetero's generic product: generic entry would require Otsuka to reduce the cost structure of its branded product "to compete," while exclusion of Hetero would deprive Hetero of the sales and profits it otherwise would earn from that competition.

122.   Defendants willfully maintained that monopoly power through anticompetitive conduct by enforcing the fraudulently procured '282 Patent to prevent Hetero's FDA-approved ANDA Product from entering the market. That enforcement insulated NUEDEXTA® from the generic-driven price erosion and other competitive pressure that Otsuka itself acknowledged would require it to "reduce the cost structure of its branded product to compete."

123.   Defendants acted with the specific intent to preserve their monopoly power by preventing Hetero from entering the relevant market before expiration of the '282 Patent. By seeking and obtaining a preliminary injunction, Defendants prevented Hetero from introducing the generic competition that Otsuka itself acknowledged would require a branded manufacturer to "reduce the cost structure of its branded product to compete."

124.   Hetero has suffered antitrust injury of the type the antitrust laws were intended to prevent. But for Defendants' enforcement of the fraudulently procured '282 Patent and the preliminary injunction obtained through that enforcement, Hetero would have commercially launched its FDA-approved generic product before expiration of the '282 Patent and competed directly with NUEDEXTA®.

125.   Competition from Hetero would have imposed downward economic pressure on NUEDEXTA® and required Otsuka to respond competitively, including by reducing the cost structure of its branded product. Defendants' enforcement of the '282 Patent prevented those competitive effects from occurring.

126.    As a direct and proximate result, Hetero lost sales, revenues, and profits it otherwise would have earned from generic entry, while consumers and other purchasers were deprived of the price competition that Hetero's entry would have produced.

127.    The causal connection between Defendants' enforcement and Hetero's injury is direct. Defendants obtained an injunction prohibiting Hetero from selling its FDA-approved generic product, and Otsuka itself acknowledged that the commercial harm to Hetero from an injunction would include the inability to earn profits from sales of its ANDA Product.

128.    Defendants' conduct therefore did not merely preserve the exclusionary effect of a patent. It prevented a ready and FDA-approved competitor from entering the market and imposing the competitive pressure that Otsuka itself recognized accompanies generic entry.

129.    Hetero's claim under Section 2 of the Sherman Act is timely under the four-year limitations period set forth in 15 U.S.C. § 15b.

130.    Hetero seeks damages caused by Defendants' subsequent enforcement of the allegedly fraudulently procured patent against Hetero and the resulting exclusion of Hetero from the market, and its continued loss of market share it would have acquired by being the first generic in the market.

131.    Defendants did not sue Hetero for infringement of the '282 Patent until May 27, 2025, after Hetero informed Defendants that it intended to commercially launch its FDA-approved ANDA Product.

132.    On July 23, 2025, Defendants obtained a preliminary injunction preventing Hetero from commercially launching its FDA-approved ANDA Product.

133.    Before Defendants enforced the '282 Patent against Hetero, Defendants had not obtained an injunction preventing Hetero from selling its FDA-approved ANDA Product and

Hetero had not suffered the market-exclusion damages for which it seeks recovery in Count IV.

134.    Hetero's alleged antitrust injury—including lost sales, revenues, and profits resulting from its exclusion from the market—arose from Defendants' enforcement of the '282 Patent against Hetero and the resulting preliminary injunction.

135.    The May 27, 2025 infringement action and July 23, 2025 preliminary injunction were affirmative enforcement acts directed specifically against Hetero that imposed new and direct economic injury by preventing Hetero from entering the market with its FDA-approved generic product.

136.    Those enforcement acts and the resulting injuries occurred less than four years before the filing of this action. Hetero's Walker Process claim therefore accrued within the limitations period because the alleged fraudulent procurement, standing alone, did not inflict the market-exclusion injury for which Hetero seeks antitrust damages; that injury arose when Defendants invoked the '282 Patent to prevent Hetero's commercial entry.

137.    Hetero is entitled to recover its antitrust damages, trebled as provided by law, together with recoverable costs and attorneys' fees.

### JURY DEMAND

Hetero demands a trial by jury on all issues for which a trial by jury is available under applicable law.

### PRAYER FOR RELIEF

WHEREFORE, Hetero respectfully requests that the Court:

A.    Enter judgment in favor of Hetero and against Defendants on the claims asserted herein;

B.    Declare that the asserted claims of the '282 Patent are invalid under one or more

provisions of the Patent Act, including 35 U.S.C. §§ 102, 103, and 112, including for anticipation, obviousness, lack of written description, and lack of enablement;

C.      Declare that the asserted claims of the '282 Patent are unenforceable as a result of inequitable conduct before the USPTO;

D.      Declare that Hetero's manufacture, use, offer for sale, sale, or importation of its ANDA Product does not infringe any valid and enforceable claim of the '282 Patent;

E.      Determine, to the extent necessary to effectuate Hetero's rights under Federal Rule of Civil Procedure 65(c), whether Hetero was wrongfully enjoined from commercially launching its ANDA Product and preserve Hetero's right to recover all damages properly recoverable under the security ordered in *Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited et al.,* C.A. No. 1:25-cv-00647-GBW;

F.      Enter judgment that Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, through enforcement against Hetero of a patent procured through fraud on the USPTO;

G.      Award Hetero its damages resulting from Defendants' violation of the antitrust laws, trebled as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15;

H.      Award Hetero its costs and reasonable attorneys' fees to the extent permitted by law, including under 15 U.S.C. §§ 15 and 26, as well as 35 U.S.C. § 285 because Otsuka's conduct in enforcing the '282 Patent procured through fraud makes this an exceptional case;

I.      Enter such further relief as is necessary to protect and effectuate Hetero's right to seek recovery for losses sustained as a result of the preliminary injunction; and

J.      Grant such other and further relief, at law or in equity, as the Court deems just and proper.

Respectfully submitted,

Dated: August 10, 2026

/s/ John C. Phillips, Jr.
John C. Phillips, Jr. (#110)
David A. Bilson (#4986)
PHILLIPS, MCLAUGHLIN & HALL, P.A.
1200 North Broom Street
Wilmington, Delaware 19806
(302) 655-4200
jcp@pmhdelaw.com
dab@pmhdelaw.com

Of Counsel (*pro hac vice* application to be filed)

Ehab M. Samual
David A. Randall
ORBIT IP, LLP
11400 W. Olympic Blvd., Suite 200
Los Angeles, CA 90064
(310) 887-1333

*Attorneys for Plaintiffs Hetero Labs Limited, Hetero Labs Ltd. Unit-III, and Camber Pharmaceuticals, Inc.*